HON. T. L. NORVAL, } JUDGES.
HON. A. M. POST,

HON. ROBERT RYAN,
HON. JOHN M. RAGAN, } COMMISSIONERS.
HON. FRANK IRVINE,

DAVID FURBUSH, APPELLEE, v. HIRAM H. BARKER ET AL., APPELLANTS.

FILED OCTOBER 17, 1893. No. 4542.

1. **Equitable Actions:** RES ADJUDICATA AS DEFENSE: DEPOSITION IN FORMER ACTION: WITNESSES: EVIDENCE CONCERNING TRANSACTIONS WITH DECEASED PERSONS. When one of the defenses pleaded in an equitable action was that the matters in controversy had previously been tried and determined adversely to plaintiff in an action brought by him against the decedent, of whom the defendants in the action pending were the heirs and personal representatives, and where the deposition of the decedent, taken in the case already determined, was introduced in evidence in the pending case merely to show the identity of the subject-matter of the two suits, the plaintiff in such suits claiming and testifying that they were not identical, the

5 (1)

Furbush v. Barker.

admission in evidence of said deposition, merely for the purpose aforesaid, did not justify the court in allowing in evidence in the pending action the testimony of plaintiff as to personal transactions or conversations between plaintiff and said deceased person as decedent's admissions relative to material matters in the action pending.

2. Pleading: FINDING FOREIGN TO ISSUES: REVIEW. Where a finding of fact embodied in a decree is entirely foreign to the issues made by the pleadings, it has no weight in this court, except that if such finding is essential to the decree, such decree. must be set aside.

3. Decree Unsupported by Evidence: REVIEW UPON APPEAL: PRACTICE. Upon appeal from a decree the findings of fact which are wholly unsustained by the evidence will be set aside, and thereupon such decree directed or entered as the facts proved clearly warrant.

APPEAL from the district court of Sherman county. Heard below before HAMER, J.

*Wall & Bradley* and *Abbott & Caldwell*, for appellants.

*Calkins & Pratt* and *Nightingale Bros.*, contra.

RYAN, C.

On the 3d day of May, 1879, William Benschoter and Eugenie E. Benschoter, his wife, for the expressed consideration of $700, conveyed by warranty deed to David Furbush certain real estate situated in Loup City, Sherman county, Nebraska, to-wit: all of block 8; all of block 9; all of block 10 except lots 13, 14, 15, and 16 ; all of blocks 11, 12, 13, and 14 except lots 5, 6, 7, and 8 in the last named block ; all of block 15 except lots 4 and 5; all of blocks 30 and 31, and all of block 32 except lots 4, 5, 7, and 8 ; all of block 33, and all of lots numbered from 44 to 93, inclusive, in block 34. On the same day Eugenie E. Benschoter aforesaid, for the expressed consideration of $800, conveyed by warranty deed to the said David Furbush all of block 27 except lots 7 and 8. On the same day Will-

iam Benschoter and Eugenie E. Benschoter, his wife, for the expressed consideration of $500, conveyed by warranty deed to David Furbush the northwest quarter of the northwest quarter of section 18, township 15 north, range 14. These deeds were filed for record in the office of the clerk of said county on the same day and were therein duly recorded. Contemporaneously with the execution of the above deeds David Furbush and wife executed to William Benschoter a mortgage on said lands to secure the payment of the entire consideration recited, one-fourth of which was payable on July 3, 1879, one-fourth on November 3, 1879, and the other half one year from the date of said mortgage. On September 17, 1887, David Furbush commenced this action in the district court of Sherman county, Nebraska, against Hiram H. Barker, Ella M. Barker, Clara Barker, James B. Edgerly, Charles W. Talpey, Hosea B. Edgerly, Charles W. Wingate, Henry R. Parker, Nathaniel Stevens as trustees of the last will and testament of Hiram Barker, deceased, Charles W. Talpey, Alonzo Nute, and John F. Hall as special administrators of the estate of Hiram Barker, deceased. This petition set forth the above conveyances and mortgage, and alleged that on the 2d day of January, 1880, the plaintiff was the owner in fee-simple, and in possession of the lands heretofore described.

The petition alleged that before the purchase of said lands by the plaintiff one Hiram Barker, late of Farmington, New Hampshire, had promised and agreed to and with the plaintiff to loan to the plaintiff sufficient money to pay for said lands when the plaintiff should need the same for that purpose. The petition further alleged that on the 2d of January, 1880, the said Hiram Barker, deceased, by his authorized agent, Noah H. Roberts, with the said William Benschoter, conspiring together to obtain the title to said lands without any just or adequate consideration, and without the consent of plaintiff, demanded of plaintiff that he should deed said lands to said Hiram

Barker, and represented and promised to plaintiff that if he would deed said lands, that the said Barker would pay said mortgage and hold said lands as security for the amount advanced, giving the plaintiff the right to redeem the same by payment of the sum so advanced, with ten per cent interest, at such further time as the plaintiff might be able to raise said sum of money; that plaintiff, desiring to keep said lands, and believing that he would be able to pay said mortgage before the whole became due, and that said land was worth a much greater sum than the amount required to be paid by said mortgage, refused to make said deed. The petition alleged that at that time Loup City had a population of only about 200, and was suffering commercial and industrial depression, which rendered the residents of said city anxious for public improvements to overcome such depression, and that they were peculiarly disposed to listen to any one who would promise such improvement, and that said William Benschoter, Hiram Barker, and Noah H. Roberts, for himself and as agent for Hiram Barker, conspiring against this plaintiff and intending and contriving to obtain the title to said lands without any just compensation, and without plaintiff's consent, represented to the people of Loup City that the said Hiram Barker was a person of great wealth, who desired to purchase said land to construct a canal and develop the water power of the Loup river, and to build and establish factories and mills and thereby make the village of Loup City an important manufacturing town, and that said Furbush was, by refusing to deed said lands, standing in the way of the future prosperity of said town and its inhabitants and preventing the development of the water power and the establishing of the mills and factories aforesaid, and that said parties, by the aforesaid means, had created a great prejudice against the plaintiff in the minds of the citizens of Loup City, who thereupon, and under the direction and incitement of said Benschoter,

Barker, and Roberts, prepared an agreement to boycott the plaintiff, and did prepare and circulate a writing pledging the signers not to allow the plaintiff or his family to enter their homes or places of business, and not to hold any social or business intercourse with plaintiff, nor to sell or give plaintiff or his family any article of food, clothing, fuel, or other necessaries of life, unless he would sell said lands, and that the writing, being so prepared and circulated, was signed by all but six of the citizens of Loup City, whereupon the boycott was established and enforced against this plaintiff; that plaintiff still refusing to make said deed, the said conspirators threatened personal violence and to tar and feather plaintiff, and that plaintiff's wife, being in feeble health by reason of the fear of injury and the hardships undergone under said boycott, became sick and feeble, and that while plaintiff's said wife was so sick and feeble, some of the said conspirators, to plaintiff unknown, attacked plaintiff's house and smashed in the windows; that said Benschoter, Barker, and Roberts, and others in collusion with them, by reason of the means aforesaid did put plaintiff and his family in great fear, and that plaintiff, through force and restraint of said wrongful acts, and not otherwise, did, on the 2d day of January, 1880, execute and deliver to said William Benschoter and Noah H. Roberts, as agent of said Hiram Barker, a quitclaim deed for said property, which was duly filed in the county clerk's office of said Sherman county, Nebraska; that at the time of the signing of said deed the said Benschoter and Roberts represented that the grantee named in said deed was the said Hiram Barker, who it was promised would hold the same as security for the amount necessary to pay said mortgage, but that said Benschoter and Roberts wrongfully and fraudulently inserted in said deed the name of William Benschoter instead of the name of Hiram Barker; that the substitution of the name of said Benschoter for that of Barker was without the knowledge or

consent of the plaintiff, which plaintiff did not discover until long afterwards; that during the time aforesaid, Noah H. Roberts was the agent of said Hiram Barker and acting under his authority and direction in each of the steps by him taken to acquire the title to said lands; that William Benschoter, about January 3, 1880, executed a certain deed whereby he pretended to convey said lands to said Noah H. Roberts, Hiram Barker, and one Stephen Nutter in equal undivided shares, which deed was duly recorded in the county clerk's office of Sherman county, Nebraska; that on May 31, 1880, said Roberts conveyed his interest in said lands to Hiram Barker, and on the same date the said Stephen Nutter conveyed his pretended interest in said lands to said Barker; that as between said Benschoter, Roberts, and Nutter on the one part, and Hiram Barker on the other, the said first parties never had any real interest in said premises, but held them in trust for said Barker and not otherwise; that the rents and profits of said lands received by Barker equaled and exceeded the amount advanced by the said Barker to pay said mortgage, with ten per cent interest thereon; that said Hiram Barker afterwards ratified the promises of his agent that said deed should stand as security for the amount advanced, and agreed to account for said lands and reconvey them to plaintiff, but that before said arrangements could be consummated, and in the month of January, 1887, the said Hiram Barker died.

The petition then alleged the appointment by will of the trustees hereinbefore named for Hiram Barker, deceased; that pending the probating of the will, Talpey, Nutter, and Hall were appointed special administrators of the estate of Hiram Barker. The petition then described the relationship of each of the Barkers named in the title of the petition to Hiram Barker, deceased, and their consequent interest in the subject-matter of this litigation. The plaintiff in his petition averred that he submitted, under advice of

counsel, that the deed as made to Benschoter was and is void and of no effect, for the reason that plaintiff executed the same under duress, and that the said deed, had it been freely and voluntarily executed, was at most but a mortgage, and that neither plaintiff nor defendant is in possession of the premises aforesaid. The prayer of the petition was that the amount paid by said Barker to redeem said mortgage and for taxes on said land might be ascertained, and that the amount received by Barker for rents and profits on said lands should also be ascertained; and what lands, if any, which had been conveyed by said Barker, deceased, and by Hiram H. Barker and Clara Barker, and the value of the same, might be ascertained; and that the deed executed January 2, 1880, might be declared void and of no effect, and a reconveyance of the property therein described be decreed; and that the defendants be required to pay the plaintiff the amount of the value of any lands sold by Hiram Barker and by Hiram H. and Clara Barker, and of the rents and profits of said lands, less the amount advanced thereon by the said Hiram Barker to redeem and pay said mortgage. The petition closes with a general prayer for equitable relief.

Stephen Nutter, on August 20, 1888, filed a petition in intervention in this case, claiming an undivided one-sixth interest in the lands which are the subject of this controversy. This claim is not controverted by the defendants, and as a determination of the matters in controversy, if in favor of the defendants, would entitle the said Nutter, upon the admissions of his co-defendants, to a one-sixth interest in the property, this branch of the case will receive no further notice.

On the 3d day of September, 1888, the defendants filed an amended answer, in which they alleged that the plaintiff falsely represented himself to be a man of large means and the agent of other men of great wealth—among whom were the said Hiram Barker, deceased, and Stephen Nutter

and others—and that he was authorized to purchase for
Barker and Nutter a large amount of real estate in the
village of Loup City and vicinity, and falsely represented
that he desired to purchase for himself, and was able to
purchase and pay for a large amount of real and other
property in the locality aforesaid; that he had but little
money with him, but would soon be in possession of ample
means, and desired but to secure a temporary credit on
his purchase; these representations were made to William
Benschoter, J. Wood Smith, —— Hartley, and other resi-
dents of the village of Loup City; that on the 3d day of
May, 1879, the plaintiff contracted with William Ben-
schoter to purchase all the property described in the plaint-
iff's petition for the sum of $2,000, which at that time
was the full value thereof, and Benschoter, relying on the
false representations made as aforesaid, sold to plaintiff the
said premises on credit and took his notes therefor; and
that at or about the same time J. Woods Smith, relying on
said false representations, sold to the plaintiff a stove and
other goods; and the said Hartley, also deceived by said
false representations, sold to the plaintiff a span of mules
on credit; and divers other persons in the village of Loup
City, relying on said false representations, sold to plaintiff
large quantities of merchandise on credit; that plaintiff
made contracts with divers other persons living in and near
said village for the purchase of large tracts of real estate,
and took bonds from said persons to convey their lands to
said plaintiff and others, the said persons so giving bonds
to convey relying on the false representations of the
plaintiff made as aforesaid, and that said parties were in-
duced to extend time of payment for said premises on like
false representations made by the plaintiff.

Defendants further alleged that about August 10, 1879,
plaintiff sold and conveyed to George H. Gibson and Will-
iam T. Gibson a portion of the premises so purchased, for
the sum of $50, and by falsely representing to William

Benschoter that it was necessary for plaintiff to return to his home in Vermont in order to procure the money then due him, and that upon his return he could and would pay all his debts, the said Benschoter was induced to release the mortgage covering a portion of the premises sold to Gibson and Gibson. The defendants alleged that plaintiff did not bring back money with him on his return from Vermont, and did not pay the debts so contracted, or any of them; that this fact became generally known in the month of November, in the village of Loup City, as was also the fact that plaintiff was not a person of means, and that he had no wealth in Vermont, but, on the contrary, was indebted to numerous persons in said state, and was wholly insolvent and unable to pay his debts, and that he was not the agent of Hiram Barker or Stephen Nutter, or any other person, nor authorized to purchase lands for any other person.

The defendants also alleged that in the latter part of November, or the first of December, 1879, a meeting was called in the village of Loup City by persons who had been induced, by the false representations so made, to extend credit to the plaintiff, to which meeting plaintiff was invited to come and explain why he had made such statements, and at said meeting plaintiff was requested to reconvey to William Benschoter all the lands which had been purchased and which then remained unsold, and to reconvey the mules and other property procured on credit by himself by means of said false representations, which demands were refused by the plaintiff. At said meeting it was agreed among the parties present that said plaintiff was not a person entitled to credit, and that said persons did then and there agree among themselves, as they lawfully might do, to refuse and deny to said plaintiff any further credit. The defendants, however, denied that Noah H. Roberts was present at said meeting, and denied that Hiram Barker, deceased, was instrumental in calling the

same; denied that the defendants or Roberts conspired with Benschoter or any other person to have said meeting called or to induce any person to refuse to sell plaintiff goods on credit; denied that it was agreed among the citizens present at said meeting to boycott the plaintiff or refuse to sell him goods and merchandise for cash; denied that the citizens of Loup City did refuse to sell plaintiff goods or merchandise for cash; denied that the citizens of that village conspired to boycott the plaintiff or refuse social intercourse with him or his family, and alleged the fact to be that if any person did so refuse to visit or hold social intercourse with the plaintiff, such refusal was based solely on his character and standing as a man and citizen, and for no other cause whatever; denied that any threat was made against the life of plaintiff, or to tar and feather him, or to do him any bodily injury.

The answer further alleged that if the goods of plaintiff were taken from him, it was under chattel mortgages giving the mortgagee the lawful right to take and dispose of said property, and that such taking, if any there was, was without any suggestion from Noah H. Roberts or other of the defendants, or Hiram Barker. The conveyance by deed of date January 2, 1880, was admitted in the answer, and it was alleged that it was upon full consideration, and only for the purpose of avoiding the necessary litigation incident to a foreclosure of the mortgage. The answer further denied, in detail, each of the averments of plaintiff's petition, and further alleged that if any agreement was ever made binding upon Hiram Barker for the reconveyance of the property, it should not be enforced on account of the lapse of eight years before this action was brought, in which time, by the building of railroads into Loup City, the value of the property had greatly increased. To this amended answer there was a reply, which was in effect a denial of each of the affirmative allegations therein contained.

It is probably necessary to a full understanding of the history of this case to state that on March 21, 1882, David Furbush filed his petition in the district court of Sherman county, Nebraska, in which he claimed of Hiram Barker the sum of $5,747, and interest thereon, as compensation for services by Furbush rendered on behalf of Barker in the purchase of lands in Sherman county, Nebraska. There was service by publication.   Issue was duly joined, and a judgment was rendered in favor of Barker against Furbush.   The testimony in this case would seem to show that the original papers in that action were not accessible at the time of the trial of this one, and, therefore, that evidence *aliunde* was given of the contents of the pleadings and as to the issues upon which that case was tried.   It would seem, however, that the sole question there tried was whether or not Furbush was the agent of Barker in the purchases as to which he claimed a commission.   It was, however, testified in this trial that the lands involved in this action were not a part of those for the purchase of which plaintiff claimed a commission in the former action, and it was testified by Mr. Furbush and two of his attorneys in this case that the former action had no reference to the lands purchased by Furbush of Benschoter.

In the trial of this action the plaintiff David Furbush testified that he was eighty years old on November 6, 1887; that he came to Loup City about April 20, 1879; that he purchased of William Benschoter the land in controversy in this action about May 21, immediately following the above date, and remained in Sherman county about four months, and then returned to New Hampshire, from whence he had come to Nebraska; that from New Hampshire he returned to Loup City the very last of October, 1879; that when he bought the land of Benschoter he gave him thereon a mortgage to secure payment, and when about to return to New Hampshire that he gave Benschoter another mortgage, which subsequent evidence shows was one of the chattel

mortgages hereinafter referred to. Plaintiff further testi-
fied that he never represented himself as the agent of Hiram
Barker until his return from New Hampshire, and that
then he represented himself as the agent to order the bond-
ing (that is, as a stipulation made in the trial shows, taking
bonds for deeds). Plaintiff testified that he, after his visit
to New Hampshire, took bonds upon the lands of David
French and others, not including Benschoter; that he re-
ceived a letter from Hiram Barker saying that Noah H.
Roberts would be at Kearney on a Friday or Saturday
named; that Roberts came and together with witness looked
over the French land where the water was to be taken out
of the Middle Loup river to be used for running mills; that
Roberts commended the plan to witness, and told witness
he had written Mr. Barker to the same effect, and that Rob-
erts said he could bring in that water $500 cheaper than
witness had recommended it to Barker. Roberts promised
that as soon as French had proved up, which he had not
yet done, he would take the property.

Plaintiff's evidence as to the William Benschoter land
was, that about two weeks after Roberts came, Roberts said
to plaintiff: "Your title is no good; you did not pay any-
thing down; if you had paid $500 down, the title would
have been good, but now it is good for nothing." Plaintiff
testified that in answer to this he said to Roberts that Judge
Wall had written Mr. Barker that his title was perfect and
requesting Barker to send to plaintiff the $2,000 that he
had promised plaintiff. Roberts made fun of this and lit
out, and plaintiff saw him no more. Mr. Furbush then
gave an extended history of conversations between himself
and Roberts with reference to "bonded lands" as he called
them, on which lands the bonds having been taken to Fur-
bush and Barker, Roberts refused to make payments un-
less he could get the Benschoter land also, and finally that
Roberts threatened to take the money back to New Hamp-
shire and not take any lands if his condition was not com-

plied with, but did not go back at the time he threatened to, but remained over another week, and that the people refused to let plaintiff have anything to eat or drink for money, and one night his window was broken, this course being taken, as witness said, with a view to "freezing him out" and compelling him to sell the Benschoter property. To accomplish this result this witness testified that the people of Loup City threatened to tar and feather him and to ride him on a rail and otherwise to injure him, and even to kill him, and that 104 people of Loup City signed a petition (which seems to have been also for a called meeting at the court house) for the purpose of compelling plaintiff to sell the Benschoter land which by reason of its situation was necessary for the construction of the aforesaid canal; that at this meeting, which was largely attended, Benschoter came in and demanded that plaintiff deed him back the land; that at this meeting Judge Wall advised that if Benschoter and Furbush had any trouble that the law should settle it, and that the people should go no further; that the people went home and so did plaintiff, and that that was the last of it. [This meeting was characterized as the "indignation meeting" all through the testimony of such of the witnesses for Furbush as referred to it in their evidence.]

Plaintiff further testified that he arranged to buy a stove of J. Woods Smith and agreed to pay him $15 per month on it, with the understanding that he could pay $25 at the end of the month; that when this stove was being delivered at the house of plaintiff, Smith came along and after some conversation between Woods and Benschoter the stove was carried back; that to secure payment for this stove plaintiff had at first given a chattel mortgage on the stove and it had been taken from plaintiff and was being returned to him when Smith ordered it taken away again. Plaintiff testified that Roberts told him that Benschoter had said "If you put that stove up we can never get the deed to the old man's land. We cannot freeze him out if he has a stove."

Plaintiff further said in his testimony that Bill Benschoter had, previous to this, taken away plaintiff's other furniture on a chattel mortgage and that the weather was very cold; witness thought the thermometer indicated 21 degrees; that they left what belonged to plaintiff's wife, to-wit, one feather bed, three husk beds, six pairs of sheets, and carpets which were put on the bed, but as they were too heavy Mrs. Furbush borrowed a feather bed of Mrs. Straw, which was used for a covering for the bed; that Mrs. Furbush remained in the house without fire for about twelve days or two weeks, while plaintiff stayed three weeks; that to keep Mrs. Furbush warm, flat irons were heated at Mr. Gordon's, but that the next morning Mr. Gordon's boy came over crying and said, "If you come in here to heat your irons or to heat your coffee, they will tear father's house down and drive you away from there;" that witness promised not to trouble them further and did not; that after this plaintiff went to Shields', taking a big wool blanket with the coffee pot and flat irons in it so that no one would know what he was carrying. Subsequently, noticing the failing health of his wife, witness said that he took his wife to the house of John Probasci, and while on the way thither that his wife fell down, though the distance was short; that she staid there two days, and then went to live with her nephew Alonzo Straw; that thereupon Mr. Hartley (and witness thought Mr. Benschoter and others) went to Straw, and Hartley told Straw that if he let plaintiff come in there, they would take the stove away and turn her out of doors (he owed ten dollars on the stove he bought) if he gave Mrs. Furbush anything to eat or drink until she signed that deed.

Plaintiff testified further that after his wife went to Straw's to live, plaintiff's wife's son came back and plaintiff lived with him for about twelve days; that Perkins staid with plaintiff because plaintiff was afraid of his life because they had threatened it; that Bill Benschoter

came into Probasci's with a club in one hand and two in the other, a foot and a half long, and said that Barker and plaintiff had bonded land in part of the city, and the grocery man had refused plaintiff anything to eat; that they could get nothing to eat unless plaintiff gave up so that Barker could get that land and pay the money over; that Benschoter challenged plaintiff to fight a duel; that upon plaintiff's refusal to fight a duel Benschoter swung a club over plaintiff's head; that plaintiff had been struck at more than fifty times before, but had never been hit; that plaintiff's temper being wrought up very high by the conduct of Benschoter, plaintiff brought down upon Benschoter's head a seven pound weight, but that Mrs. Probasci grasped plaintiff's arm, or, as plaintiff's expressed opinion was, there would at the time of the trial been no Benschoter; that at this time Benschoter was, as they call it in the east, "three sheets in the wind and one a fluttering;" that Benschoter threatened witness if he did not deed over the land he (Benschoter) would kill plaintiff; that Mr. and Mrs. Straw told plaintiff that "they were going to throw Mrs. Furbush out of doors if the deed was not made."

Plaintiff testified as to the making of the deed to Benschoter; that while Mrs. Furbush was at the house of Mr. Straw, Blackburn (whom extrinsic evidence shows to have been the attorney of Benschoter) went and made some bargain with Mrs. Furbush to sign that deed; that witness did not know what that bargain was, nor what was paid Mrs. Furbush; that John Probasci, a justice of the peace, was over frequently and said to plaintiff that he had better sign the deed, that it would not be worth the paper it was written on; that the Congregational minister advised plaintiff to do it, and plaintiff finally went up and signed it by his advice under protest; that before signing the deed plaintiff had not been permitted to see his wife for eight or nine days; that Taylor refused to sell plaintiff beans,

though offered cash for them; that Benschoter procured Taylor to refuse plaintiff food because his furnishing food would prevent Benschoter getting his deed from plaintiff. Plaintiff said in his testimony that when goods were refused him he had seen Roberts at the back part of the store, but that Roberts never said anything. Plaintiff further testified that he agreed with John Probasci to make the deed to Hiram Barker; that there was some paper made out, and this deed put in the hands of D. D. Grow to be delivered to plaintiff's wife; that she said: "Mr. Grow, wi'l you give me what they put in your hands if I sign that deed?" to which Grow answered: "I will unless they kill me;" that she signed the deed and plaintiff signed it; that you can see that her hand trembled, she was sick and should have been in bed; that plaintiff supposed the deed was made to Hiram Barker; after a week or so heard that it was in Nightingale's office, and went over there and forbade them recording it; that Mr. Grow said it was recorded an hour after it was made; that plaintiff asked Roberts why he had practiced the deception on plaintiff, and Roberts said it was to save $500; that he, Roberts, had offered Benschoter $5,500, but that he wanted $6,000, and that if he took the deed in his own name William Benschoter would know that he, Roberts, would want to take all the other land and he would have to have that $500; that plaintiff, when he joined in the deed, supposed it was only a lease or privilege of bringing water over the land; that he executed it to save the life of his wife and himself.

Plaintiff further testified that they sent a bill of sale for the stove to his wife and set it up that same day, and from thence forward there was peace; that the usage she had sustained greatly impaired the health of plaintiff's wife and ultimately caused her death. The deed was signed January 2, 1880. When asked what his wife got for signing the deed plaintiff answered: "You ask her or somebody that

knows better than I do. I think there was a report that she got a horse which she gave to Mr. Perkins. I heard she got $250 and a horse for signing the deed. I never asked her what she got for signing it." The property was worth, in plaintiff's judgment, $10,000.

On his cross-examination plaintiff said: "I heard that Blackburn drew the deed; I don't think I saw it; the paper was put into Grow's hands and the deed, or whatever it was, laid down and a blotter over it, and then D. D. Grow, in presence of Probasci, justice of the peace, took the acknowledgment. My wife and I did not know what was under the blotter. I protested to Mr. Grow and all that were there against signing the deed. When I protested I said: 'I sign this deed not on my account, but on my wife's account.'"

On being recalled as a witness on rebuttal plaintiff testified that he was never the agent of Barker until the 15th or 20th of October, 1879, and was not authorized to buy land for Barker until that time; that he had been in partnership and company with Barker and had worked with him in New Hampshire.

The paper spoken of as having been delivered contemporaneously with the deed was a lease, the consideration of which was $50, which was recited as paid up, upon lots 1 and 2, in block 27, in Loup City, for the term intervening between January 2, 1880, and April 1, 1880; also a lease of all the breaking on the northwest quarter of section 18, township 15 north, range 14 west, from January 2 till November 1, 1880, consideration $10, acknowledged as paid. The lessor was William Benschoter, and the lessee was Martha A. Furbush.

In respect to the evidence given by Mr. Furbush it is proper to observe that upon it alone his right of recovery, if any there was, must be based, and that he was directly contradicted on many points, and but slightly corroborated in any respect by his own witnesses. It is true that his

step-son gave a statement of what he testified transpired at
Farmington, New Hampshire, between Hiram Barker and
several of his neighbors on the one hand, and David Fur-
bush on the other, but as the subject-matter of that con-
versation was the lands "bonded" subsequently to October
13, 1879, it is not deemed important in this case.

Upon the final hearing before his honor, Francis G.
Hamer, presiding judge of the district court of Sherman
county, the following decree was rendered:

"And now on this 7th day of December, 1889, this cause
came on to be heard before the court upon the petition,
answer, and reply, the petition of intervention of Stephen
Nutter, and the answer of plaintiff thereto, whereupon
the court finds from the evidence that long prior to the
purchase of the land in controversy by the plaintiff from
William Benschoter and extending over a long period of
years, the deceased Hiram Barker, and the plaintiff David
Furbush, have been accustomed to take contracts of various
kinds together and were doing business together at or near
the town of Farmington, New Hampshire; that in these
transactions the said Barker furnished the capital required
and the said Furbush represented the business, or performed
the labor required, and that the profits of these transactions
were divided between them; that in pursuance of their
long established business as set forth, the plaintiff came
from Farmington, New Hampshire, to Loup City in Sher-
man county, Nebraska, in quest of joint investments in
land and water powers for the benefit of said Hiram Bar-
ker and himself; that said plaintiff was to examine and se-
lect the lands and report to said Hiram Barker on the
advisability of making each proposed purchase and invest-
ments, and the said Barker was to furnish the money re-
quired for such investment, and the profits from each
transaction were to be separately ascertained and divided
between said Hiram Barker and plaintiff; that in pursu-
ance of this relation the plaintiff came to Loup City, Ne-

braska, from Farmington, New Hampshire, and selected
for himself and the said Hiram Barker many tracts
of land in and about said Loup City aforesaid, includ-
ing the lands in controversy in this case, and valua-
ble mill site and water power; that said David Furbush,
in pursuance of said arrangement, obtained tracts from
the said owners of said lands and property, whereby
they separately agreed with the said Furbush and Barker
to receive from the said Furbush and Barker certain speci-
fied sums of money as the purchase price of said lands and
property and consideration thereof to convey and transfer
the same to said Furbush and Barker; that among the
lands so selected and contracted for were the lands in con-
troversy in this case, for which said Furbush received
deeds of conveyance as mentioned in the pleadings, and
the said Furbush and wife secured the payment of the pur-
chase price thereof by the execution and delivery of their
notes and mortgages by and with the understanding and
agreement aforesaid that the said sums of money necessary
to purchase said land would be furnished by the said Hi-
ram Barker, and the said notes and mortgages taken up
and canceled; that said land was purchased by said Fur-
bush on joint account for himself and said Hiram Barker;
that the said Furbush, after obtaining the legal title to
said land, being the land in controversy in this action,
and the possession thereof, did desire to retain the same
for his own exclusive use and benefit and not to share
the profit of the purchase and sales thereof with the said
Barker, and did make known the said desire to the said
Barker; that the said Barker then proceeded by his own
efforts and the efforts of one Roberts, who acted as his
agent, and by the efforts and conduct of many persons in
Loup City, who were incited thereto by the said Barker
and his agent Roberts, to boycott, coerce, terrify, and force
the said Furbush and his wife by duress to release and
surrender their possession and title to said land, to-wit:

(Here follows the description of the real property as set forth in the petition.)

" To that end the plaintiff's only stove was removed from his dwelling house in the winter season of the year that he might be deprived of fire, and the windows of his dwelling house were destroyed and the bed-clothing removed from the house, so that the plaintiff, then of the age of seventy-five (75) years, and his aged and invalid wife, might be compelled to suffer with the cold of winter; that the plaintiff was threatened with personal violence, with being tarred and feathered; that he was denied the privilege of purchasing food; that by duress, against his will, and because of hunger and cold, lack of bed-clothing, lack of shelter, because of physical suffering, and threats of violence, did with his wife surrender, they said, to the said Barker, and to cancel the said purpose thereof the said Furbush was compelled to convey said land to the said William Benschoter, who thereupon, as a part of said system and plan of duress and in pursuance of an arrangement entered into between him and the said Barker through said Barker's agent, Roberts, did convey the same, directly or indirectly, to the said Barker; and the court further finds that the lands in controversy were purchased by the said David Furbush on joint account for himself and the said Hiram Barker, and to be paid for by money to be furnished by the said Hiram Barker, and that the title thereto has been held by the said Barker in trust for the said David Furbush and himself; that the intervenor Stephen Nutter has no interest whatsoever in the lands in controversy; that the profits derived from the transactions arising from the said purchase and sale of said lands and premises should be equally divided between the said Furbush on the one hand and the defendant on the other. It is ordered that an accounting be had showing the purchase and sale of all the said lands and all expenses and taxes, and that further evidence be taken by George E. Evans, of

Kearney, Nebraska, in the matter of accounting and to establish the present value of the property undisposed of with the view to the rendition of a judgment and decree upon this finding, and the making of such further orders and decrees in the premises as the court shall seem meet and proper, the referee to report the facts and evidence at the next term; to all of which several findings and the orders of the court the defendants and Stephen Nutter severally except; the plaintiff excepts to that part of the court's finding which finds that the said lands were bought on joint account of the plaintiff and Hiram Barker, deceased, and that said defendants have a joint interest in said premises with plaintiff."

Pursuant to the requirements of the above decree, a referee was appointed, who made due report upon the matters as to which his investigation and report were required. He found that the total amount paid out by the deceased Hiram Barker in his lifetime, and the defendants since his death, for the purchase of lands and all expenses, including commission of George Bickford, the agent by whom sales of real property were made, was $6,253.50, for which amount the defendants were entitled to a credit. The referee found that there had been received of rents and profits of the property in controversy, and insurance paid upon a loss sustained, the sum of $11,695.25. The referee further found that the deceased, during his lifetime, and the defendants since his death, had sold and conveyed a large part of the lands in controversy. The report of the referee was confirmed on the 16th day of June, 1890, and it was in pursuance thereof adjudged and decreed as follows:

"1. That the plaintiff is the owner in fee-simple of an undivided one-half interest in the unsold described lands and lots, and that the defendants be, and are hereby, ordered and directed to convey to plaintiff, by good and sufficient deed of conveyance, such undivided one-half interest in said lots and lands; and in case of a failure to ex-

ecute and deliver such conveyance within twenty days from the date of this decree, it is further ordered and decreed that this decree operate as, and have the effect of, such conveyance, and it shall vest in the said David Furbush and in his heirs forever an undivided one-half interest in the above lands and lots.

"2. That the plaintiff have and recover of the defendants the sum of $2,720.87, that being one-half of the excess received by the deceased and defendants from said lands over and above the amount paid by them in relation thereto, and that the plaintiff has a valid and subsisting lien upon the undivided one-half held by the defendants for said sum with interest thereon at the rate of seven per cent interest per annum from the 5th day of March, 1890."

This language of the decree was followed by a judgment for costs and specific directions as to the sale of the defendants' interest in the property for the satisfaction of said costs. The penal sum of the supersedeas bond was fixed at $20,444.

Perhaps it is unnecessary to call attention to the obvious variance between the averments of the petition, the statement of facts of the witness Furbush, and the findings of the court. One state of facts which the petition recited was that Furbush, having purchased the lands of Benschoter and given to Benschoter a mortgage to secure the payment of the purchase price, found himself unable so to do, and that Hiram Barker, by his authorized agent, Roberts, with Benschoter, conspiring to obtain the title, demanded that plaintiff should deed the land to Barker, and as an inducement promised that if he would deed the land as requested, Barker would assume the payment of the mortgage, giving the plaintiff the right to redeem upon the payment of the amount with ten per cent interest thereon. There was no evidence to support this averment, neither did the court find that it was sustained.

Another ground upon which the conveyance was sought

to be avoided in the petition was because of the alleged duress under which the plaintiff and his wife were compelled to convey the lands on January 2, 1880, to William Benschoter, under the representation that it was to Hiram Barker, who thereunder would assume and pay the mortgage as aforesaid.. The most critical examination of the testimony adduced by plaintiff fails to disclose that Hiram Barker was in any way connected with any ill usage of or threats toward either plaintiff or his wife. Moreover, there was no testimony given on behalf of Mr. Furbush which would connect Noah H. Roberts with the ill treatment of which the plaintiff complains. The evidence of the plaintiff in that regard was simply, that at some time when he was refused goods of some character Noah H. Roberts was in the back part of the store. Plaintiff does not pretend to say that he was near enough to hear what transpired on that occasion. Roberts himself testified, on the contrary, that he took no part in anything of the kind, and in so far as he was able dissuaded others from any maltreatment of the plaintiff and his wife. The evidence of the plaintiff himself quite clearly discloses that the deprivation of the stove, bed and bedding, and other articles of furniture, by which the plaintiff and his wife were compelled to suffer from the inclement weather, was due wholly to the several chattel mortgages which the plaintiff had made upon the property taken, and which he had been unable to pay. It might be inferred from the testimony of the plaintiff that Benschoter and Hartley made such use of these chattel mortgages as would bring about the reconveyance to Benschoter of the property which he had previously deeded to plaintiff, but neither Noah H. Roberts nor Hiram Barker was a party either to said mortgages, nor did either of them appear to be in any way connected with their foreclosure. The several merchants, as to whose refusal to sell him goods for cash the plaintiff testified, were sworn and each gave other reasons than a desire to oppress plaintiff for the

refusal to sell him goods. In one case the subject-matter which the plaintiff desired to purchase was beans, and in respect to them the merchant testified that he wanted them for seed; that they were not for sale. In most instances, however, the merchants in interest testified that the reason they refused to sell was that the plaintiff did not tender them the money, and they regarded his credit as bad.

We cannot forbear comment upon the findings of the learned judge. One of the facts which he found as existing was, that Furbush and Hirman Barker had been together doing business back in New Hampshire for a long time, and that Barker furnished the capital and Furbush represented the business and performed the labor required, and that the profits of these transactions were divided between them; that in pursuance of this long established practice plaintiff came from New Hampshire to Loup City in search of joint investments for himself and Barker, and that plaintiff was to examine and select lands and report .to Barker the advisability of making the proposed purchase and investment, and Barker was to furnish the money required therefor, the profits were to be separately ascertained and divided between Barker and the plaintiff; and that in pursuance of this arrangement plaintiff came to Loup City and selected and contracted for a large amount of land, including that in controversy, and contracted with the several owners for the conveyance to himself and Barker of the tracts so selected, and agreed with said owners for payment out of funds to be advanced by Barker. The finding was, further, that the tracts of land in dispute were purchased in this way, and that Furbush and his wife secured the payment of the purchase price thereof by the execution and delivery of the notes and mortgages, with the understanding and agreement aforesaid that said sums of money necessary to such purchase of said lands would be furnished by Hirman Barker, and that the notes and mortgage would be taken up and can-

celed, and that said land was purchased by said Furbush on the joint account of himself and the said Barker. It is unnecessary to greatly amplify remarks upon this finding, viewed in the light of the petition or even of the evidence of Mr. Furbush himself. There was no arrangement, either pleaded or sworn to, whereby Barker agreed in any way, or whereby it appeared that Furbush understood that there was an agreement that this purchase of Benschoter was for the joint account of the plaintiff and Barker. His evidence is quite to the contrary. It is that Furbush bought this land in April, 1879; and he directly testified, upon being recalled to the stand, that he was never the agent of Barker for any purpose until after his return to New Hampshire in October, 1879. This finding, therefore, was not only foreign to the issues tendered by the petition, but was wholly unsupported by the evidence.

In respect to the finding that Barker proceeded by his own efforts, and the efforts of Roberts, and by the efforts and conduct of many persons in Loup City, who were incited thereto by said Barker and his agent, Roberts, to boycott and terrify and force said Furbush and wife under duress by deed to surrender their title to said lands, it is proper to remark that Barker was never outside of New Hampshire, so far as the evidence shows; certainly no one testified that he was ever in Loup City. The testimony fails entirely to connect either Barker or his agent with the boycott of which the plaintiff complains. Furthermore, a fair consideration of the testimony of Furbush himself shows that the conveyance of January 2, 1880, was made in pursuance of an agreement entered into between Mrs. Furbush and counsel for William Benschoter. Very awkwardly Mr. Furbush attempts to deny knowledge of the payment to his wife of the sum of $250, and the giving to her of a stove and horse and lease of property in Loup City, and also of lands broken out on the forty acres by him purchased of Benschoter, as a consideration for the conveyance

executed on January 2, 1880. Moreover, the testimony of
this witness is, that the deed he gave was given under pro-
test. When asked how he protested, he said that he told
the parties that he made the conveyance not on his own
account, but on account of his wife. The conclusion dedu-
cible from all the evidence is very clear, however, that his
wife received the consideration above named for the execu-
tion of the deed to this property, and if, as the protest
implied, the plaintiff conveyed on her account, it would
seem that, when she had received a valuable consideration
for the conveyance, this protest was rather unseasonable.
Again, he says that the reason he made the conveyance was
that he supposed it was a lease to Hiram Barker, by whom
the mortgage was to be paid, and he himself entitled to re-
deem upon reimbursement to Barker of the principal and
interest expended in discharging the mortgage. It will be
remembered that the land in dispute was purchased in May,
1879; that Furbush had no authority upon his own evi-
dence to act as the agent of Barker until October of the
same year. There is no competent testimony that when
Furbush returned to New Hampshire in October, 1879,
Barker made any such agreement as is claimed in respect
to taking up and holding the mortgage made in May by
Furbush to Benschoter. It is true that there was ad-
mitted in evidence statements of Furbush as to a conver-
sation of that character had between himself and Barker
upon the occasion of his visit in October, 1879. This was
a conversation, however, between this plaintiff and a per-
son since deceased, whose representatives are made de-
fendants in this action, and was in respect to a per-
sonal transaction had between the plaintiff and said Hiram
Barker. It was admitted in evidence apparently because
the deposition of Hiram Barker, taken in a case com-
menced against him in 1882 by Furbush, was introduced
in evidence in this case for the purpose of showing what
matters were in controversy in the former case. The plaint-

iff himself had sworn, however, that the subject-matter of the second action was entirely different; that the agency in respect of which he claimed compensation was created in October, 1879, and authorized him to procure bonds for deeds for lands which thereafter he might select, and to avoid the claim that the cause of action set up in this case was not adjudicated in the former case, both the plaintiff and two of his attorneys testified to the difference in the subject-matter of the two suits.   It seems to us that this was not a sufficient reason for overruling the objection to the testimony offered predicated upon the provision of section 329 of the Code of Civil Procedure.   The exception to the admission of the statements of a person having a direct legal interest in the result of a civil action or proceeding, when the adverse party is the representative of a deceased person, to-wit, "unless the evidence of the deceased person shall have been taken and read in evidence by the adverse party in regard to such transaction or conversation," did not authorize the introduction of the testimony of Furbush in this case upon the point now under consideration.   There was therefore no competent evidence to establish the existence of an arrangement whereby Hiram Barker undertook to hold this mortgage, as found in the decree of the district court.

This completes a review of the essential facts upon which the decree of the district court is predicated.   After a full and careful consideration of all the evidence used in the trial of this cause in the district court, the belief engendered upon the testimony of Furbush is rendered an absolute certainty.

As to the general reputation of Furbush for truth and veracity, a great deal of evidence was introduced upon impeachment.   It is unnecessary to weigh this evidence to the detriment of Mr. Furbush, though it may be remarked that where a man has lived in a neighborhood for fifty or sixty years, and a large number of his neighbors will tes-

tify that his reputation for truth and veracity is bad, it
might be safe, in a close case, to reject his evidence. There
is, however, no necessity for resorting to such impeachment.
There is, aside from the matters already reviewed, an in-
trinsic improbability in other facts stated by Furbush in his
testimony.   In New Hampshire for many years he was
harassed by trustee processes, and some of his own witnesses
testified that in relation to promises to pay his debts he was
"rather shaky."   From 1870, at least, up to the time of
his coming to Nebraska, the records show that he was every
year giving chattel mortgages, or real estate mortgages, for
the security of his creditors. Finally, it is shown that the real
property of which he was possessed was transferred to two
grantees in consideration of their assuming the incumbrance
upon the property.   Mr. Furbush in New Hampshire
took small contracts to do stone-work in the building of
cellars, and construction of chimneys and dams and other
like improvements, but in none did he have large means or
much backing.   It is inconceivable that, under these cir-
cumstances, he could induce the making of a loan to him-
self for the purchase of 10,000 acres of land, even at the
current price in Sherman county, Nebraska, as early as
1879.   The correspondence which has been introduced in
evidence in no way justifies, or tends to justify, such confi-
dence in him on the part of Barker.   Added to all these
considerations is the acquiescence in the title of Barker
from May, 1880, until the commencement of this suit on
the 17th of September, 1887, a period of almost eight
years..  Under the issues, and upon a full consideration of
all the testimony introduced as sustaining the averments of
the petition, the conclusion is irresistible that in many re-
spects the findings of the decree are foreign to the plead-
ings, and that in no material respect does the evidence
sustain the conclusions reached on the former trial.  No
attempt has been made to review this evidence in detail, for
it would be impossible, requiring, as it does, five bound
volumes to present it in this court.

The judgment of the district court is reversed, and a decree will be entered in this court conformably to the prayer of the amended answer of the defendants as to the undivided five-sixths of the land in controversy, and as to the other undivided one-sixth, a like decree will be entered in favor of Stephen Nutter.

DECREE ACCORDINGLY.